# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### June 24, 2003 Session

## STATE OF TENNESSEE v. WILLIAM PAUL EBLEN

**Direct Appeal from the Criminal Court for Knox County**
No. 67260     Richard R. Baumgartner, Judge

---

**No. E2002-01221-CCA-R3-CD**
**September 26, 2003**

---

The Defendant, William Paul Eblen, was convicted by a jury of two counts of aggravated rape and one count of aggravated kidnapping. The trial court sentenced the Defendant to two concurrent terms of twenty-four years for the rapes, and to a concurrent term of eleven years for the kidnapping, all to be served in the Department of Correction. In this direct appeal, the Defendant challenges the sufficiency of the evidence; alleges that the prosecutor committed reversible misconduct during closing argument; and complains that the trial court erred in overruling his petition for writ of error coram nobis. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, William Paul Eblen.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Scott Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The eighteen-year-old victim, C.P.,[1] testified that she left her apartment to go to the Breezeway market at about 8:45 on the evening of August 31, 1998. She stated that she drove her car, and followed the car driven by the sister of her friend and neighbor, Melissa Tapp. Melissa was in the back seat of the car driven by her sister. C.P. explained that Melissa's car went through the drive-thru window of the market first; C.P. was behind in her car. No one else was with C.P. Melissa's car drove off, and C.P. pulled up to the window. She placed her order and was driving away when she heard a man who had been standing nearby yell at her that she had dropped some

---

[1] It is the policy of the authoring judge to identify victims of sex crimes by their initials.

money. She stopped, and the man walked up to the passenger side of her car. C.P. testified that the man got into her car, pulled a gun, and told her to drive.

C.P. testified that the man had been wearing a green shirt and brown khaki shorts. The man told her not to look at him. He took off his shirt and wrapped it around his head, leaving only his eyes showing. He told C.P. where to drive. When they reached a back road, the man told C.P. to stop and get out of the car. The man followed C.P. and made her go to the front of the car. He told her to lay down on the ground; she did so. The man then got on top of her, pulled a knife, and sliced open the front of her dress. The man then told C.P. to take off her underwear, which she did. C.P. was on her menstrual period and told the man that she was wearing a tampon. The man told her to remove it; she did. The man then pulled his pants down and raped her vaginally. When C.P. tried to push the man away, he struck her three times in the face. The rape lasted for several minutes, until C.P.'s attacker ejaculated.

The man got up and told C.P. to get up. The two returned to the car, and the man told C.P. to drive. At this time, the victim did not know where the gun was located. After she had driven around for a while, the man told C.P. to pull over again, in an alley. The man told the victim to get out and bend over the hood of the car. When C.P. complied, the man pulled her underwear down and raped her anally. The victim testified that she told the man to stop, that it hurt; she testified that she could "feel it ripping." The man did not stop until he had ejaculated again. They then re-entered the car and the man told C.P. not to call the police or he would have her killed. The man then shoved a ten-dollar bill in her mouth, told her, "Thanks for a good time," wiped the car down with his shirt, and left.

The victim drove home and told Melissa Tapp and Melissa's sister that she had been raped. Melissa flagged down a policeman, and an ambulance arrived shortly thereafter to transport the victim to the hospital.

On cross-examination, the victim admitted that she had called the police about her boyfriend, Tony Norris, the night before (August 30, 1998). She swore out a complaint stating that Mr. Norris had shoved her around, put her on the floor, and punched her in the lip. Later in the trial, she stated that she did not remember testifying at the preliminary hearing that she had seen another man talking with the Defendant at the Breezeway market while she was at the window.

Dr. Timothy Gunter examined the victim at the emergency room and collected evidence for a rape kit. He testified that the victim arrived at the emergency room at 12:24 a.m. The victim told him that she had been sexually assaulted. Dr. Gunter testified that the victim had a hematoma (bruising and swelling) on her right cheek. This appeared to be a new injury, that is, having occurred within the previous two hours. Dr. Gunter testified that the hematoma on the victim's cheek was consistent with having been inflicted by a fist. Dr. Gunter also testified that he observed irritation on the victim's labia, which is usually caused by friction. There was also some blood from the victim's menstrual period. Dr. Gunter testified that C.P.'s rectal area was "diffusely swollen, the whole rectal area, and there was a small tear." He explained that the area "appeared to be

traumatized," that the tear was "fresh," and that the injuries were most likely caused by some type of penetration trauma.

On cross-examination, Dr. Gunter stated that he had examined C.P.'s back and saw no cuts or scrapes. He admitted that rectal tears can be caused by bowel movements. He also testified that the victim's facial injuries did not appear to have been inflicted on the previous night, August 30.

Knoxville Police Department Officer Larry Franklin Vineyard spoke briefly with the victim at the hospital. He noticed a small cut to her upper lip and redness in her face. He described these injuries as "consistent with injuries that occurred immediately after an assault." He subsequently visited the Breezeway market and spoke there with a Mr. Mullins. Mr. Mullins told Officer Vineyard that the Defendant had been at the market the night before and advised him of one of the Defendant's relatives who lived nearby. Officer Vineyard spoke with the relative and asked him to have the Defendant contact him. Officer Vineyard later heard from the Defendant's mother and visited her house to speak with the Defendant. Officer Vineyard spoke with the Defendant late in the morning on September 1, and collected the clothes which the Defendant told him he had been wearing the night before. Officer Vineyard described these clothes as a blue shirt and aqua pants. Officer Vineyard also prepared a photographic line-up containing six photographs, including one of the Defendant. When the victim was shown this line-up, she identified the Defendant as her assailant in "less than probably five seconds."

Subsequent laboratory testing revealed the presence of sperm in swabs taken from the victim's vaginal and rectal areas. DNA testing revealed that the sperm matched the DNA profile obtained from a sample of the Defendant's blood, to a statistical probability of "one in 3.29 quintillion."

Melissa Tapp testified that she had known the victim about two years and that they had been best friends. She testified that she saw no marks on C.P.'s face at the time they all left to go to the store. She also testified that she had seen a man standing near the Breezeway drive-thru window at the time she was there in the car ahead of the victim's. The man was wearing beige shorts and a green t-shirt. The next time she saw the victim was at the apartment. She heard a car horn blowing like someone was "laying on it." She went out about five minutes later and found the victim in her car. She described the victim as "[h]er eye was black, and her dress was torn." Ms. Tapp testified that the victim was crying, upset, looked terrified, and was saying she had been raped. Ms. Tapp flagged down a police officer.

Officer Mark Fortner was the patrol officer flagged down by Ms. Tapp. He spoke with the victim at the apartment. He testified that she had some red marks on her face and "was pretty distraught." He described the marks on her face as appearing "pretty fresh." C.P. gave him a ten-dollar bill and told him that her attacker had given it to her.

Officer Mark Waggoner collected evidence at the crime scene and also at the hospital. He took photographs of the victim and took into custody the rape kit and the victim's clothes. He testified that the victim had a split upper lip and bruising on her right cheek and right eye.

Officer James L. Miller, Jr. testified on behalf of the Defendant. He explained that he had reported to the victim's residence on the night of August 30, 1998, on a domestic call. The victim told him that she had been in an argument with her boyfriend, Tony Norris, and that he had struck her with his fist. Officer Miller testified that he observed the victim to have a split lower lip.

Michael Ralph Mullins also testified on behalf of the Defendant. He testified that he was at the Breezeway market at the same time as the Defendant on the night of August 31. Mr. Mullins testified that he saw a car pull up to the window, and the Defendant asked the woman driving if she would give him a ride to the Pilot. Mr. Mullins testified that the female responded, "sure," and leaned over and opened the car door from the inside. The Defendant got in and they drove off. Mr. Mulllins described the woman as "friendly, and laughing, and cutting up, and going on." He described the Defendant's clothing at that time as a white t-shirt and baggy white shorts. Mr. Mullins stated that it was between eight and nine o'clock in the evening when he observed this event.

The Defendant also testified. He stated that he had known the victim since 1996 because she and his wife were friends. The Defendant and his wife lived next door to Terry Norris' mother. The foursome visited with each other frequently. He saw the victim at the Breezeway market on the night in question between 10:30 and 10:45. He stated that the car in front of the victim's was Judy Cooper's, and he did not see Melissa Tapp that night. The Defendant asked the victim if she would drive him home in exchange for gas money. She said yes, and he got in her car. They drove to a gas station and pulled into the parking lot. There, they commenced talking and flirting. The victim was complaining about her boyfriend, Terry Norris. They then drove to a nearby park. The Defendant stated that he did not ask the victim to drop him off at his mother's because he "wanted to do more," that he "felt [he] had a chance to do more," and that the "opportunity was - was there." At the park, they got out and talked for about five minutes. They then "started to kiss each other" and "proceeded to have sex." The Defendant did not accost the victim with a gun or a knife, and had neither with him. The victim did not protest or ask the Defendant to stop. When they finished, they returned to the victim's car and drove toward the Defendant's mother's house. There, they stopped in an alley behind the house and had sex again.

On cross-examination, the Defendant stated that both episodes of sex were vaginal. He explained that a total of about thirty minutes elapsed between the time he got in the victim's car and they had sex the first time. The first episode lasted about fifteen minutes. It took them two minutes to get to the alley, at which point they talked for a couple of minutes and then had the second episode of intercourse. This episode lasted five minutes. The victim then dropped the Defendant off behind his house and left.

The Defendant examined the victim's dress, which had earlier been admitted into evidence, and acknowledged the tears in the fabric. He stated that the dress had not been like that when he left

-4-

the victim. He also stated that he did not know how the victim's rectal area came to be injured. He testified that he had not noticed any marks or bruises or puffiness on her face while they were together. He stated that they had kissed while having sex and that the victim had not complained about a hurt lip. He testified that he gave the victim ten dollars for gas.

The Defendant acknowledged that Officer Vineyard asked him to give a blood sample. He testified that he refused to give a sample on Officer Vineyard's advice. He also testified that the victim was lying, but that he didn't "have a clue" as to why.

Officer Vineyard testified on rebuttal and denied having advised the Defendant to refuse the blood test. He stated that he "encouraged him to take the test" but that the Defendant refused. He also testified that Mr. Mullins told him on the morning after the incident that he had been at the store, saw the victim drive in, and as she was starting out of the exit, saw the Defendant yell at her. The victim stopped, and he saw the Defendant go get in her car.

On the basis of this proof, the jury convicted the Defendant of two counts of aggravated rape with a deadly weapon and one count of aggravated kidnapping to facilitate a felony.

**ANALYSIS**

As a preliminary matter, the State has alleged that the Defendant did not timely file his motion for new trial. The judgment forms in this case indicate that they were entered on June 29, 2001. The motion for new trial was filed on July 31, 2001, outside the mandatory thirty-day filing period. See Tenn. R. Crim. P. 33(b). Upon motion of the Defendant to correct the judgments, the trial judge made a specific finding that he did not sign the judgment forms until July 2, 2001, at the earliest. The trial judge specifically declined, however, to alter or amend the judgment forms.

The Defendant now contends that a judgment cannot be "entered" until it has been signed by the trial judge. However, the Defendant cites us to no case law directly on this point. Our supreme court has noted the distinction between the "rendition" of a judgment and its "entry:"

> "Rendered" means expressed or announced in a conclusive manner and with decisive effect, certainly so when at the same time notation of it is made on a judgment docket, or other more or less permanent memorandum record kept by the Judge for the purpose. "The rendition of judgment, and the entry of judgment, are different and distinct, each from the other. The former is the act of the court, while the latter is the act of the clerk of the court."

Jackson v. Jarratt, 165 Tenn. 76, 79, 52 S.W.2d 137, 138 (1932) (quoting Anderson v. Mitchell, 58 Ind. 593, 594 (1877)). Thus, as our court of appeals has recognized, "[t]he 'entry' of a judgment has been defined as 'the ministerial act by which enduring evidence of the judicial act of rendition of judgment is afforded.'" Brannon v. County of Shelby, 900 S.W.2d 30, 33 (Tenn. Ct. App. 1994) (quoting Carter v. Board of Zoning Appeals of Nashville, 377 S.W.2d 914, 916 (Tenn. 1964)). We have found no controlling authority stating that a judgment must be signed by the trial judge prior

to the judgment being entered. Indeed, contrary to the Defendant's position, this Court has held on several occasions that a judgment is not void for lack of the rendering judge's signature. See James Russell Gann v. David Mills, Warden, No. E2003-00281-CCA-R3-PC, 2003 WL 21714064, at *1 (Tenn. Crim. App., Knoxville, July 24, 2003), and cases cited therein. Thus, it would appear that a judgment can be "entered" prior to, or even without, being signed by the trial judge.

Of course, this confusion could be obviated if trial courts established a procedure whereby judgments were not dated and entered until signed by the judge. In that event, there would be no question as to the date from which the time for filing a new trial motion begins to run. In this case, we need not determine whether, for the purposes of this appeal, the trial court needs to amend the judgments.[2] The failure to timely file a motion for new trial results in the waiver of most issues otherwise appealable. See Tenn. R. App. P. 3(e). However, a challenge to the sufficiency of the evidence is not thereby waived. See, e.g., State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Thus, we will address the Defendant's contentions in that regard. With respect to the Defendant's contention of prosecutorial misconduct during closing argument, that issue is normally waived if not raised in a timely new trial motion. Here, however, the Defendant raises that issue in the context of plain error. Trial errors rising to the level of plain error are not waived by an untimely motion for new trial. See Tenn. R. Crim. P. 52(b).

Finally, the Defendant's issue concerning the trial court's denial of his petition for writ of error coram nobis arises outside the context of the original trial, and is, indeed, a separate proceeding. Thus, it is not an issue subject to being raised in a motion for new trial, and we will address it on the merits in this appeal. See State v. Mixon, 983 S.W.2d 661, 671 (Tenn. 1999).

In short, this Court has jurisdiction to review the issues before it in this appeal, irrespective of whether the Defendant's motion for new trial was timely filed. Because the issue of the effective date of entry of the judgments is moot, we decline to address it further.

## SUFFICIENCY OF THE EVIDENCE

The Defendant contends that there is not sufficient evidence to support his convictions. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102,

---

[2]We note that trial courts are empowered to correct clerical mistakes affecting their own documents. See Tenn. R. Crim. P. 36.

105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

The Defendant was convicted of two counts of aggravated rape with a deadly weapon. That crime is defined as the "unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . [f]orce or coercion . . . used to accomplish the act and the defendant is armed with a weapon[.]" Tenn. Code Ann. § 39-13-502(a)(1). Here, the victim testified that the Defendant was armed with both a gun and a knife, and used both to threaten her. The Defendant unlawfully sexually penetrated the victim on two separate occasions, both of which were accomplished by force or coercion. Medical proof corroborated the victim's testimony. The Defendant acknowledged having had sex with the victim. The Defendant's argument that the evidence is not sufficient rests on the claim that the State's proof is not credible. This Court does not address issues of credibility of witnesses; the jury does. The evidence being more than sufficient to support the Defendant's two convictions of aggravated rape, this issue is without merit.

The Defendant was also convicted of one count of aggravated kidnapping. As charged in this case, that crime is committed upon the false imprisonment of another, to facilitate the commission of any felony. See Tenn. Code Ann. § 39-13-304(a)(1). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a). The proof in this case, taken in the light most favorable to the State, established that the Defendant falsely imprisoned the victim within her own car in order to commit the felony of aggravated rape. The proof being more than sufficient to support the Defendant's conviction of this charge, this issue is without merit.

## PROSECUTORIAL MISCONDUCT

The defense theory offered at trial was that the victim willingly engaged in sex with the Defendant, but claimed rape in order to avoid reprisal by her violent boyfriend. During defense counsel's examination of witnesses, the points were made that it was possible that the victim had torn her own dress, and that the injury to her rectum had been caused by a bowel movement. During initial closing argument, the prosecutor countered this theory with the following:

What else are they trying to get you to swallow? Her dress wasn't like that when she left [the Defendant]. Well, how did it get this way, [Defendant]? It is clearly ripped, folks. No question about that. Are we to believe, as well, the suggestion or the innuendo that is made that she ripped her own dress to make it look better? I suppose she cut her own rectum to make that look better, too, and created the swelling by penetrating something into her rectum to make that look better.
. . .
Pardon my French. The tear in her rectum. I suppose she did that on the way home from the alley over in Western Heights, as well. And maybe while she was doing that, she made her rectum swell up like the doctor described to you. What did the doctor tell you that was consistent with? Trauma, penetration. <u>And they can't explain that. You get [defense counsel] to stand up here and explain that to you. He is going to have the opportunity. I challenge him right now. How did that happen?</u>

Although no objection was interposed to the underlined portion of the argument, the Defendant now contends that the prosecutor's statements constituted an impermissible shifting of the burden of proof to him.

Later in his initial closing argument, the prosecutor stated the following:

When [Officer] Vineyard first got up to [the Defendant's] place the next day, we have heard on and on and on about what a cooperative sort [the Defendant] has been. Of course, then we find out here just about half an hour ago that this man, who is trying to convince you that he just has consensual sex with [C.P.] some twelve hours before, <u>when this officer gets up there to talk to him, what does he do? He wants to talk to a lawyer</u>.

Again, no objection was made to this portion of the prosecutor's argument. On appeal, however, the Defendant contends that the prosecutor's statement constitutes an impermissible comment on the Defendant's exercise of his constitutional right to counsel.

Where a prosecuting attorney makes allegedly objectionable remarks during closing argument, but no contemporaneous objection is made, the complaining defendant is not entitled to relief on appeal unless the remarks constitute "plain error." <u>See</u> Tenn. R. App. P. 3(e); Tenn. R. Crim. P. 52(b); <u>see also</u> <u>State v. Marshall</u>, 870 S.W.2d 532, 540 (Tenn. Crim. App. 1993); <u>Taylor v. State</u>, 582 S.W.2d 98, 100 (Tenn. Crim. App. 1979). In order to determine whether the challenged remarks constitute plain error, we must consider five factors. <u>See</u> <u>State v. Smith</u>, 24 S.W.3d 274, 282 (Tenn. 2000). Those factors are:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue

for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

Id. at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before we will find plain error. See id. at 283. Ultimately, the error must have been "'of such a great magnitude that it probably changed the outcome of the trial.'" State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994) (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

With respect to the first challenged portion of the prosecutor's initial closing argument, the first factor has been established. However, we do not find that the prosecutor's challenge to defense counsel to "explain that" breached a clear and unequivocal rule of law. That is, we conclude that the comment did not impermissibly shift the burden of proof to the Defendant. The prosecutor's comments, taken in context, were a challenge to the credibility of the Defendant's theory of how the victim's rectal area came to be injured. During the trial, defense counsel had proffered proof of how the injury could have been caused by a bowel movement. The prosecutor wanted the jury to reject that theory. We note that the challenged comments were made during the State's initial closing argument. Thus, the prosecutor knew full well that defense counsel would soon be addressing the jury with his own interpretation of the proof. The State was taking a preemptive strike at the argument it expected from the Defendant. Such argument was not improper. Thus, the second factor for the determination of plain error during closing argument has not been satisfied.

For the same reasons, we find that the third and fifth factors have likewise not been satisfied. Accordingly, the Defendant has failed to establish that this portion of the prosecutor's closing argument constituted plain error, and this issue is therefore without merit.

With respect to the second portion of the argument complained of, we find the first factor to be satisfied. We further find the second factor to be satisfied. The prosecutor specifically referred to the Defendant's invocation of his constitutional right to counsel during questioning by the police. The prosecutor did so in order to cast doubt on the Defendant's theory that his intercourse with the victim was consensual, and to cast doubt on his posture of cooperation with the police. "A violation of [a] defendant's right to counsel occurs when a prosecutor's . . . argument seeks to penalize the defendant for exercising his constitutional right." State v. Hines, 919 S.W.2d 573, 580 (Tenn. 1995). Such penalizing occurs when a prosecutor asks the jury to draw a negative inference from a defendant's exercise of his right to counsel. See id. For the same reason, we find that a substantial right of the Defendant was adversely affected, satisfying the third Smith factor. Because the record is devoid of any indication that the Defendant waived this issue at trial for tactical reasons, we also find the fourth factor satisfied.

We thus arrive at the fifth factor: whether consideration of the error is necessary to do substantial justice. We note that the error here is one of constitutional dimensions: that is, the prosecutor violated the Defendant's constitutional right to counsel. Such errors must be found harmless beyond a reasonable doubt before an affected defendant is denied relief. Cf. State v.

Transou, 928 S.W.2d 949, 960 (Tenn. Crim. App. 1996) (prosecutorial comment on the defendant's constitutional right against self-incrimination subject to review for harmless error beyond a reasonable doubt). We have no trouble concluding that, in the overall context of this trial, and in the overall context of both the State's and the Defendant's closing arguments, the challenged statement by the prosecutor was harmless beyond a reasonable doubt. The jury did not convict the Defendant because he wanted to speak to a lawyer; it convicted the Defendant because the proof of his guilt was overwhelming. Accordingly, we hold that the Defendant has failed to establish that he is entitled to a new trial on the basis of the State's closing argument, and this issue is therefore without merit.

## DENIAL OF WRIT OF ERROR CORAM NOBIS

The Defendant filed a petition for a writ of error coram nobis on the basis of newly discovered evidence. See Tenn. Code Ann. § 40-26-105. At the hearing, the Defendant introduced testimony from three witnesses. Robert Lamb testified that he had dated the victim for about a month in July 1999. During this time, the victim told him that the Defendant had raped her. However, after the victim became drunk, she told him "that the only reason she said it was because, if Terry [Norris] found out, and she was going to -- he told her that, if she didn't put a charge on [the Defendant], that he was going to beat her up or whatever. And that is why she took the charge out." Mr. Lamb did not pass this information on to anyone prior to the Defendant's trial. Mr. Lamb admitted to having met the Defendant while incarcerated on an aggravated assault conviction arising from his beating his girlfriend.

Mr. George Byrd also testified. He stated that he began dating the victim around February 2001. They dated for several months. During this time, the victim told him she had to go to court regarding a rape charge. Mr. Byrd testified that the victim told him "that there wasn't nothing to it" and that "the only reason she said it was to keep her boyfriend, Terry Norris, at the time from beating her up." Mr. Byrd did not pass this information on to anyone before the Defendant's trial. Mr. Byrd was also serving time on a felony conviction and was incarcerated with the Defendant.

Ms. Wilma Bell, Mr. Byrd's mother, also testified that the victim told her that "the boy didn't rape her, that she was testifying to that in fear of her boyfriend -- her ex-boyfriend." Ms. Bell told no one about this information prior to the Defendant's trial because she "didn't know what to do."

The victim also testified. She acknowledged her relationships with Mr. Lamb, Mr. Byrd, and Ms. Bell, but flatly denied their testimony. She reiterated that the Defendant had raped her.

The trial court took the Defendant's petition under advisement and subsequently issued a written order. In analyzing the evidence presented to it, the trial court correctly applied a three-prong test to determine whether the Defendant had established his right to a new trial. That test is: (1) the trial judge is reasonably satisfied that testimony given by a material witness was false and that the new testimony is true; (2) that the defendant was reasonably diligent in discovering the new evidence, or unable to know the falsity until after the trial; and (3) that the jury might have reached

a different conclusion had the truth been told. See State v. Mixon, 983 S.W.2d 661, 672-73 n.17 (Tenn. 1999).[3] In applying this test, the trial court determined:

> [D]efense counsel was diligent in attempting to locate these witnesses prior to trial, but was unable to do so, therefore, meeting that prong of the test. The court is not convinced, however, that a material witness, in this case, [the victim], testified falsely, or that the new testimony presented by Mr. Lamb, Mr. Byrd, and Ms. Bell is credible. Mr. Lamb and Mr. Byrd are both former boyfriends of the victim . . . and were incarcerated with the Defendant . . . following his conviction in this case in May 2001. Their testimony, considered together with all the other facts and circumstances of this case, is simply not credible. The testimony of Ms. Bell, while more troubling, also lacks credibility sufficient to justify a new trial in this case. When the court considers the entire record in this case, including the victim's testimony, the physical and medical evidence, and the testimony of corroborating witnesses, the court is satisfied that a proper verdict was reached.

On the basis of these findings, the trial court denied the Defendant's petition.

This Court reviews a trial court's denial of a petition for a writ of error coram nobis under an abuse of discretion standard. See Teague v. State, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988), overruled on other grounds by Mixon, 983 S.W.2d at 671 n.13. We will find an abuse of discretion only where a trial court applies an incorrect legal standard, or reaches a decision which is against logic or reasoning and causes an injustice to the complaining party. See State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).

Here, the trial court made specific findings about the witnesses' credibility. On the basis of those findings, the trial court concluded that the first prong of the applicable test was not met. We find no abuse of discretion on the trial court's part in this regard. Accordingly, we decline to reverse the trial court's ruling denying the Defendant's petition, and find this issue to be without merit.

### CONCLUSION

The Defendant has failed to establish that he is entitled to a dismissal of his convictions, or a new trial. Accordingly, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE

---

[3]In Mixon, this test was applied to newly discovered recanted testimony. We deem this test equally appropriate for newly discovered evidence of the material witness's prior statements inconsistent with his or her trial testimony.